THOMAS E. BECK SBN 81557
thebecklawfirm@gmail.com
**THE BECK LAW FIRM**
P.O. BOX 101
Los Alamitos, CA 90720
Tel: 562 795-5835

DAVID S. McLANE (No.124952)
dmclane@mbllegal.com
**McLANE, BEDNARSKI & LITT, LLP**
975 East Green Street
Pasadena, California 91106
Tel: (626) 844-7660
Fax: (626) 844-7670

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

RONNIE VELAZQUEZ, ABRAHAM VILLALOBOS,

Plaintiffs,

vs.

CITY OF DOWNEY, COUNTY OF LOS ANGELES, DOWNEY PD DET. GILBERT TOLEDO, DET. DWAYNE COOPER, DET D. PONDER, DET. D. SAMANO, DOES 1-10,

Defendants.

No.

**COMPLAINT FOR DAMAGES**

1. Violation of Civil Rights By Individual Defendants (42 U.S.C. §1983)
2. *Monell* Claim City of Downey Angeles (42 U.S.C. §1983)
3. *Monell* Claim County of Los Angeles (42 U.S.C. § 1983)
4. Failure to Supervise by Individual Defendants (42 U.S.C. § 1983)
5. California Civil Rights Claim (Civil Code 52, 52.1)

**DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1. This civil rights action seeks compensatory, special and punitive

damages from defendants for causing Plaintiffs to be deprived of rights, privileges and immunities secured by the federal Constitution and Amendments thereto, the laws of the United States and the State of California in the wrongful homicide convictions of the Plaintiffs resulting in lengthy state prison terms. In 2024, Plaintiffs were judicially determined to be factually innocent owing to the unconstitutional harms directly caused by City of Downey Police Officer Defendants, the City of Downey and the County of Los Angeles.

2. Defendants, and each of them, did the acts and omissions hereinafter alleged, wilfully, intentionally, in bad faith and with knowledge that their conduct violated well established and settled constitutional precedents and statutory law.

## JURISDICTION & VENUE

3. Jurisdiction of this court is invoked under 28 U.S.C. §§ 1343, (1), (2), (3) and (4). This action at law for money damages arises under Title 42 U.S.C. Section 1983 and the United States Constitution, the laws of the State of California and common law principles to redress a deprivation under color of state law of rights, privileges and immunities secured to Plaintiffs by said statutes, and by the First, Fourth, and Fourteenth Amendments of the United States Constitution.

4. The acts and omissions complained of commenced in or around September 2, 2000 and continued through 2024 within the Central District of California. Therefore, venue lies in this district in accordance with 28 U.S.C. § 1391.

## PARTIES

5. Plaintiffs RONNIE VELASQUEZ, hereinafter (Ronnie) and ABRAHAM VILLALOBOS hereinafter (Abe or Abraham) at all relevant times

hereto were residents of the State of California, County of Los Angeles.

6. Defendant CITY OF DOWNEY, hereinafter "CITY" is at all relevant times hereto was, a duly authorized public entity or political subdivision organized and existing under the laws of the State of California. The Downey Police Department, hereinafter (DPD) is, and all relevant times was, an agency or subdivision of Defendant CITY. The CITY and Downey Police Department are located within the County of Los Angeles and within the jurisdiction of the Central District of California. At all relevant times, CITY and DPD possessed the power and authority to adopt policies and prescribe rules, regulations and practices affecting the operation of the DPD and the actions of DPD employees, including customs, policies and/or practices relating to police tactics, methods, investigations, arrests, evidence, and discovery as well as to personnel supervision, performance evaluation, internal investigations, discipline, records maintenance, and/or retention. Defendant CITY is sued as a local government entity under 42 U.S.C. § 1983 because its customs, policies, and/or practices with regard to the operation of DPD were a moving force behind the constitutional deprivations and violations claimed by Plaintiffs herein.

7. Defendant COUNTY OF LOS ANGELES (hereinafter COUNTY) is, and at all times relevant hereto was, a duly authorized public entity or political subdivision organized and existing under the laws of the State of California. The Los Angeles District Attorney's Office, (hereinafter LADA) is, and all relevant times was, an agency or subdivision of Defendant COUNTY and LADA and within the jurisdiction of Central District of California. At all relevant times, COUNTY and LADA, possessed the power and authority to adopt polices and prescribe rules, regulations, and practices affecting the operation of the LADA, and LADA employees, including customs, policies, and/or practices relating to

the prosecution of criminal offenses, compliance with constitutional and statutory requirements, oversight of law enforcement tactics, methods, investigations, arrests, evidence and discovery and adminstration of policies and practices ensuring compliance with constitutional requirements; as well as to personnel supervision, performance evaluation, internal investigations, discipline, records maintenance, and/or retention. Defendant COUNTY is sued as a local government entity under 42 U.S.C. § 1983 because its customs, policies and/or practices with regard to the operation of LADA were a moving force behind the constitutional deprivations and violations claimed by Plaintiffs herein.

8. At all times relevant herein, Defendant Detective GILBERT TOLEDO was employed as a gang crimes and homicide law enforcement investigator, employed by and working on behalf of DPD. In his capacity as a DPD detective employee, TOLEDO acted under color of law and actively participated in the investigation resulting in the wrongful arrest, prosecution, conviction and incarceration of Plaintiffs. TOLDEO is sued in his individual capacity.

9. At all times relevant herein, Defendant Detective DWAYE COOPER was employed as a gang crimes and homicide law enforcement investigator, employed by and working on behalf of DPD. In his capacity as a DPD detective employee, COOPER acted under color of law and actively participated in the investigation resulting in the wrongful arrest, prosecution, conviction and incarceration of Plaintiffs. COOPER is sued in his individual capacity.

10. At all times relevant herein, Defendant Detective D. SAMANO was employed as a gang crimes and homicide law enforcement investigator, employed by and working on behalf of DPD. In his capacity as a DPD detective employee,

SAMANO acted under color of law and actively participated in the investigation resulting in the wrongful arrest, prosecution, conviction and incarceration of Plaintiffs. SAMANO is sued in his individual capacity.

11. At all times relevant herein, Defendant Detective D. PONDER was employed as a gang crimes and homicide law enforcement investigator, employed by and working on behalf of DPD. In his capacity as a DPD detective employee, TOLEDO acted under color of law and actively participated in the investigation resulting in the wrongful arrest, prosecution, conviction and incarceration of Plaintiffs. TOLDEO is sued in his individual capacity.

12. Plaintiffs are is informed and believe and thereon allege that each of the Defendants designated as a DOE is responsible in some manner for the events and happenings herein referred to, and thereby proximately caused injuries and damages as herein alleged. The true names and capacities of DOES 1 through 10, inclusive, and each of them, are not now known to Plaintiffs, who therefore sue said Defendants by such fictitious names and will be added to this action as provided by California Code of Civil Procedure Section 484 and Federal Rule of Civil Procedure 15.

## GENERAL ALLEGATIONS

13. At all relevant times, each and every defendant was the agent and/or employee and/or co-conspirator of each an every other Defendant and was acting within the scope of such agency, employment and/or conspiracy and/or with the permission and consent of other co-defendants and/or at the direction of the other co-defendants and/or committed acts/omissions that were ratified by the other co-defendants.

14. Each of the defendants caused and is responsible for the unlawful conduct and resulting injury herein alleged by, inter alia, personally participating in the conduct; acting jointly and/or in concert with the conduct of others; authorizing and/or acquiescing to the conduct; failing to intervene and/or take action to prevent the conduct; promulgating policies, procedures, and/or practices (including training and education) pursuant to which the conduct occurred; failing to promulgate policies, procedures, and/or practices which would have prevented the conduct; failing to initiate and maintain adequate training, supervision, policies, procedures and/or protocols; failing to implement and ensure compliance with policies, procedures and practices to prevent the deprivation and violation of rights of individuals including the Plaintiffs; and/or ratifying the conduct of persons under their direction and control.

15. Whenever and wherever reference is made in this complaint to any act/omission by a defendant, such allegation and reference will also be deemed to mean the acts and omissions of each defendant individually, jointly, and/or severally.

16. Each paragraph of this complaint is expressly incorporated into each cause of action which is a part of this complaint.

## FACTUAL ALLEGATIONS

### A. BACKGROUND

17. Plaintiffs Ronnie Velasquez and Abraham Villalobos were residents of the County of Los Angeles in the cities of Bellflower and Paramount respectively. They knew of one another but were not close friends. On September 2, 2000 Velasquez was 18 years of age and Villalobos was 21. At approximately 10:00PM, Ronnie Velasquez attended at a party at the Vagabond motel in the

City of Bellflower arranged by Cesar Castenon. Ronnie wore a sky blue athletic jersey with large white numbers. Among those present were Plaintiff Abraham Villalobos, Cesar Castenon, Brian Olguin, and Sergio Torres, aka "Silent" (hereinafter Silent) and others. Silent wore a blue flannel plaid Pendelton long sleeved shirt. Velasquez, Castenon and Torres had a friend in common, Maria Mona Mieja "Mona". Mona resided at Apartment 12, 12525 Demming Street. Downey with her mother Dalila Rodriguez. Ronnie, Castenon and Torres called Mona several times during the evening to encourage her to join them at the Vagabond. She agreed and expected to be picked up at her home by Castenon and/or Torres. At the same time, Castenon sought to purchase methamphetamine from Ronnie. Ronnie agreed to sell it to him if Castenon gave him a ride to Ronnie's parents home in Bellflower. Castenon drove Olguin, Silent, and Ronnie to Ronnie's home where Ronnie obtained the methamphetamine.

18. Upon returning to the car, the conversation turned to picking up Mona. Mona's apartment complex in Downey was known as being located in the territory of Compton Villa Tortilla Flats, a rival gang to Silent's Dog Patch gang . Silent demanded Castenon first drive to Silent's uncle Guadalupe "Lupe" Garcia's home in Bellflower to arm himself. Ronnie, Castenon and Olguin wanted only to return to the party and get high but Silent insisted and got his way. Silent entered his uncle Lupe's home and returned with a .25 caliber chrome pistol he wore in his waistband. They traveled to Mona's Demming Street address where Plaintiff Ronnie exited as Castenon and Olguin waited. Silent joined Ronnie. They passed through a gate making a noise that alerted Roberta Benavides and Michael Roybal, age 16, Ronnie's childhood friend, to their presence. Benavides and Roybal peeked through a window overlooking the staircase Silent and Ronnie were ascending. Ronnie did not know Roybal was at Mona's residence. Ronnie and Silent approached Mona's door. Silent knocked

loudly as Ronnie stood to his right. Roybal glanced through the peephole, recognized Ronnie and announced Ronnie's presence to Roberta Benevides, then seated in the living room. Benavides was staying temporarily with Mona and her family. Roybal went to notify Mona that Ronnie was at the door. Surprised Ronnie arrived instead of Silent or Castenon, Mona informed Roybal to tell Ronnie she was showering and would be ready shortly. Roybal returned to the front door through the living room where Benevides remained seated on a couch. Roybal opened the door toward himself, exposing himself to Silent and Ronnie at the threshold. Roybal was a large man who blocked Benavides' view of who was standing at the door. As Roybal explained Mona was showering, without warning, Silent suddenly fired two rounds into Roybal's chest.

19. Roybal, Benavides and Ronnie shouted and screamed as Roybal fell to the floor. Shocked by what Silent had done, Ronnie fled downstairs followed by Silent, witnessed by neighbor Guillermina Gomez. Gomez dashed upstairs to Mona's apartment where she came upon Roybal mortally wounded. Together with Mona's mother Delilah who was home and woken up by the shots, and Benevides, attending to Roybal. Delilah dialed 911. On that call Delilah spoke to the operator communicating questions and answers between Benevides and the operator while she and Benevides were in the living room. When asked if she knew who fired shot, Benevides said she did not; that she had not been able to see the shooter's face, only that a blue flannel plaid sleeve and left hand holding a shiny gun came into view at the doorway opening and fired.

20. Ronnie and Silent ran to the car where Castenon and Olguin waited. Ronnie angrily demanded to know why Silent shot the guy in the apartment, exclaiming everyone in that apartment knew who Ronnie was, that Roybal was his friend, and fearing he'd be implicated in Silent's shooting, angrily condemned

Silent's foolish violence. Silent casually responded "that's what gangsters do." Responding to their verbal assaults and criticism by Ronnie, Castenon and Olguin, Silent suddenly fired his gun into the floorboard to scare and shut them up. This caused Ronnie, Castenon and Olguin to fear for their lives. Castenon believed momentarily Silent had shot Olguin who sat in the front passenger seat, directly in front of Silent. Castenon, Olguin and Ronnie wanted to be quickly rid of Silent and they remained quiet as Castenon drove to the Vagabond. Upon their arrival, Silent exited, not returning to the party and disappeared with his firearm. Castenon and Olguin, still shocked and furious with Silent, drove to another location and got high. Ronnie went home still stunned and angry at Silent.

21. Throughout all of these events, Abraham was at the Vagabond and knew nothing of what happened at Mona's apartment. Abraham, William Martinez, Tony Sanchez and a person known only as "Raccoon" left the Vagabond for home as the party ended. Abraham was arrested two weeks later and remained in custody for 16 years based entirely on the false, coerced identification testimony of Roberta Benavides and the unconstitutional and incompetent investigative misconduct by Defendants TOLEDO, COOPER PONDER, SAMANO and DOES 1-10.

**B. DPD INVESTIGATION**

22. Downey Police Department patrol officers responded to the scene whereupon Officer M. Haxton took Benavides' initial statement. At that time, Benavides repeated what she has said to the 911 operator, denying she could identify the shooter, having not seen his face. She stated she heard Roybal say to Mona that "Hoodlum's here" referring to Ronnie by his street moniker. She told Officer Haxton that Roybal opened the door and said to someone unseen at the

door that Mona was in the shower. She informed Haxton that she witnessed a muzzle flash, heard shots and that the shooter wore a blue plaid flannel long sleeve shirt while the second person wore a light blue jersey with white numbers.

23. DPD Defendants investigation quickly identified Ronnie as one of two persons at Mona's apartment door. Said investigation uncovered telephone numbers that made calls to Mona's phone from Silent and Castenon prior to the shooting. They also learned Silent made a call shortly after the shooting to Mona wherein he warned Mona asking her what she was telling police about him. Mona informed Defendant Toledo that Silent could have been the second person at the door. Defendants obtained search warrants for Silent's apartment in Long Beach where they found a blue and white plaid flannel Pendelton shirt Benavides had described as being worn by the shooter, but failed, inexplicably to tie it to Benavides account that the gun was seen in the left hand of a person wearing that kind of shirt.

24. Instead, throughout their investigation, Defendants Toledo and Cooper pressed Benavides into providing false identification testimony that Ronnie wore the blue and white plaid flannel Pendelton, even though they knew through two witnesses, Ronnie wore the jersey with large white letters. Defendants knew from witness Gomez that one of the two subjects she saw flee the shooting wore this jersey which Ronnie was still wearing when arrested. Silent was caught lying by Toledo when he denied making any calls to Mona before or after the shooting, contradicted by Mona's and Silent's phone records which proved Silent phoned Mona's number within 90 minutes of the shooting. Defendants learned Silent was under investigation by the Los Angeles County Sheriffs Department for an earlier murder and was reputed to be a homicidal gangster. Defendants investigation disclosed Ronnie was friends with Roybal and

had no motive to harm or kill him, whereas Silent belonged to a gang rival to Roybal. Defendants also knew from Silent's interview that Silent correctly identified the firearm as a .25 caliber, a detail no one but Silent and investigating officers knew. Silent's blue and white plaid flannel Pendelton shirt was seized, but never put to Gunshot Reside (GSR) testing which would have inculpated Silent as having fired a weapon.

25. Defendant Toledo swore a search warrant affidavit disclosing his knowledge of the evidentiary importance of the sky blue and white football jersey and the blue and white plaid flannel long sleeved shirt Benavides described but imputed it to Abraham, rather than Ronnie. In the same Probable Cause statement, Toledo, under oath, misrepresented that by 11:30 the same morning of the shooting, Benavides had positively identified Ronnie from a photo lineup as having shot Roybal, omitting his knowledge she had actually not seen or identified anyone. Toledo's sworn affidavit added that Benevides had seen Ronnie wearing a blue and white football jersey and did not have the gun, while the unidentified second suspect in the blue and white plaid flannel long sleeved Pendelton shirt did. Later in the investigation, Defendants switched the blue and white Pendelton from Abraham to Ronnie to make it appear consistent with their theory of the crime. And notwithstanding defendants understanding of the importance of Benavides' description of the person wearing the blue and white long sleeve flannel Pendelton shirt firing the gun, they were unable to establish that article of clothing at either Ronnie's or Abraham's residences and only at Silent's Long Beach bedroom. Defendant Toldeo's sworn search warrant affidavit disclosed that after Ronnie and Abraham were in custody, someone with knowledge of the murder was paging Eric Garcia-a friend of Ronnie's with whom Ronnie was with when arrested and to whom Ronnie was explaining what had happened- from a telephone number associated with Silent, who was not in

custody. Toldeo had determined that telephone number was used to phone Mona at 4:16 AM on the morning of the shooting Mona identified as Silent. Mona confirmed to Defendant Toledo that Silent could have been the second person at her door. Toledo telephoned Silent wherein Silent lied and Toledo knew he had. Silent claimed not to have attend the Vagabond party and claimed first he was home with his mother and then changed that alibi claiming instead he was with uncle Jaime. Silent claimed he made no calls to Mona. Toledo confronted him with his knowledge of Mona's phone records to which Silent lied again and admitted he phoned Mona after the time the shooting took place. Silent revealed to Toledo that a .25 caliber gun was being sought in connection with Roybal's killing. This detail could only have been known by the shooter, yet neither Defendant Toledo or any other DPD detectives made any effort to investigate how Silent would know that critical fact. Defendants also failed to identify or contact Silent's alleged alibi witness-his uncle Jaime. DPD gang detectives were soon learning street talk that Silent had shot someone the night of the Vagabond party. Silent was never arrested or further interrogated about his role in the crime.

26. Instead, the DPD defendants fabricated false identification of Ronie and Abraham by witness Benavides, despite Benavides' statements to the 911 operator, witness Gomez and officer Haxton, denying she could see the shooter or the second subject at the door, Defendants coerced and persuaded Benavides, first in a photo line up, to identify Ronnie and Abraham, and then at the 11/13/2000 preliminary hearing and at plaintiffs' jury trial October 11-16, 2001. As to Abraham, Defendants chose, inexplicably, not to interview Abraham's 4 alibi witnesses and coerced and persuaded Benavides to testify she saw Abraham at the door with Ronnie. To insure Benavides would keep with Defendants suggestions and coercions and inducements, Benavides was paid DPD bribe money to falsely identify Ronnie and Abraham with rent and subsistence and under the false guise

she was being threatened by cohorts of Ronnie and Abraham when defendants knew there were no such threats. At trial, Benevides corruptly and falsely elevated and embellished her identification of Abraham, lied that she not only knew Abe from recently hanging around Mona's apartment complex with Ronnie, but that Abe assisted her wheelchair bound mother on one occasion, none of which was true.

**C. ARREST, PROSECUTION, AND CONVICTION**

27. Defendant detectives presented the case against the Plaintiffs to the district attorneys office, submitting a probable cause affidavit, reports and statements. As detailed herein, these reports and statements presented false information, misrepresented witness statements and omitted material exculpatory information, including suggestive, coercive and improper eyewitness identification techniques that produced Roberta Benavides' false identification of plaintiff Ronnie as the shooter and Villalobos as being present at the door when, in fact, Silent fired shots and not Ronnie Velasquez.

28. Toledo and co-defendants suppressed exculpatory evidence known to them that Silent was more likely the person who killed Michael Roybal and persuaded Roberta Benavides to elevate her initial non recognition of Ronnie Velasquez and Abe Villalobos to positive identification and false testimony of having recognized Villalobos on multiple occasions prior to September 2, 2000.

29. Notwithstanding the evidence known by Toldeo and his DPD co-defendants, pointing to Silent as the perpetrator, defendants corruptly suppressed *Brady* evidence failed to disclose what evidence they knew about Silent's involvement in the homicide to the trial court and the district attorney preventing Plaintiffs from defending themselves by presenting third party culpabilty

evidence to the jury proving Silent as the actual killer. Attempts to identify Silent as being the true shooter at the trial were shut down by Toledo's failures to reveal what the DPD investigation disclosed about Silent's involvement and his likely motive for shooting a male occupant of Mona's apartment. These nondisclosures denied Plaintiffs a fair trial. Defendants willfully deceived the court with misrepresentations that there was no evidence Silent had any part in the shooting of Roybal when they knew there was.

30. Additionally, Defendants fraudulently concocted and fabricated a gang-related motive for Ronnie's shooting his young friend which had no basis in the known facts, i.e., that the shooting was a demonstration of fidelity to the Dog Patch gang into which Ronnie supposedly was attempting to join; that the shooting was designed to promote the supremacy of Dog Patch, a much larger gang than Brown Nation. Roybal belonged to no gang, let alone a rival to Ronnie or Abraham , and DPD detectives, including Toledo, knew Silent belonged to Dog Patch which were rivals to Compton Villa Tortilla Flats, which claimed control of the Demming Street apartments, including Mona's brother who resided with her family in apartment 12.

31. Plaintiffs were found guilty by a Norwalk jury and sentenced to prison, Ronnie for life, Abraham for 15 to life. Repeated post conviction efforts over the years to prove their wrongful convictions failed until 2023 whereby the Conviction Integrity Unit of the District Attorneys office reexamined the case with new evidence, including confessions and admissions by Silent to his uncle Lupe Garcia; Lupe's witnessing Silent's appearance at his home on 9/2/2000 witnessing Silent's destruction and disposition of the gun he used to kill Roybal, Silemces presence in the car used to and from the scene of the crime and more. The District Attorneys office moved the Superior Court to vacate Plaintiffs'

convictions and dismiss all charges against them. On March 6, 2024 the Superior Court declared Plaintiffs factually innocent. Ronnie was released from prison after serving 23.5 years in custody. Abraham served 16 years in prison for a crime they did not commit.

## PARTICIPATION, STATE OF MIND AND DAMAGES

32. With respect to the acts and/or omissions alleged herein, each individual Defendant acted illegally, and without authorization.

33. Each individual Defendant participated in the violations and deprivations alleged herein, and/or directed the violations alleged herein, and/or knew or should have known of the violations alleged herein and failed to act to prevent them. Each Defendant ratified, approved or acquiesced in the violations alleged herein.

34. As joint actors with joint obligations, each individual Defendant was and is responsible for acts and/or omissions of the other.

35. Each individual Defendant acted individually and in concert with the other Defendants and others not named in violating Plaintiffs' rights.

36. With respect to the acts and/or omissions alleged herein, each Defendant acted deliberately, purposefully, knowingly, recklessly and/or deliberate indifference. Each Defendants acts and/or omissions were done with deliberate indifference to, or reckless disregard for, Plaintiffs' rights or the truth in engaging in the conduct alleged herein.

37. As a direct and proximate result of the described acts, omissions,

customs, practices, policies, and decisions of the Defendants, Plaintiffs were
wrongfully arrested, prosecuted, convicted and incarcerated for decades.

38.  As a direct and proximate result of his their wrongful arrests,
prosecution, convictions and incarcerations, Plaintiffs lost their liberty and the
quality and enjoyment of their lives both during and after their periods of
incarceration and thereafter.

39.    As a direct and proximate result of their wrongful arrests,
prosecution, conviction and incarcerations, Plaintiffs have suffered, continue to
suffer, and are likely to suffer into the future, extreme and severe mental anguish,
mental and physical pain and injury, fright, nervousness, anxiety, shock,
humiliation, indignity, embarrassment, harm to reputation and apprehension. For
such injuries, they have incurred and will incur in the futher significant damages.

40.    As a direct and proximate result of their wrongful arrests,
prosecutions, convictions and incarcerations, Plaintiffs lost past and future
earnings.

41.    As a direct and proximate result of their wrongful arrests,
prosecution, conviction and incarceration, Plaintiffs have been deprived of
existing familial relationships, the society and companionship of existing friends
and family, and the opportunity to marry and raise families.

42.    The acts and/or omissions of Defendants, and each of them, were
willful, wanton, malicious, oppressive, in bad faith, and done knowingly,
purposefully, and/or with deliberate indifference to and/or reckless disregard for
Plaintiffs' constitutional rights and the truth, entitling Plaintiffs to exemplary and

punitive damages from each individual Defendant.

43. By reason of the acts and/or the omissions of the Defendants, and the harms caused thereby, Plaintiffs were required to retain an attorney to institute and prosecute the within action, and to render legal assistance to Plaintiffs, that they might vindicate the deprivation and impairment of their rights and resulting damages. By reason thereof, Plaintiffs request payment by Defendants of reasonable attorneys fees and costs.

**FIRST CLAIM FOR RELIEF**

**DEPRIVATION OF CIVIL RIGHTS BY INDIVIDUAL DEFENDANTS**

**42 U.S.C. § 1983**

**(Against All Individual Defendants and Does 1-10)**

44. Plaintiffs reallege all foregoing paragraphs and any subsequent paragraphs contained in this complaint, as if fully set forth herein.

45. Defendants TOLEDO, COOPER, PONDER, SAMANO and DOES 1-10, while acting under color of law, caused Plaintiffs to be deprived of rights, privileges and immunities secured to them by the Constitution and laws of the United States, including the First, Fourth, Fifth and Fourteenth Amendments by, inter alia, fabricating evidence, failing to disclose material exculpatory evidence, failing to correct false evidence, using suggestive and improper eyewitness identification techniques resulting in false and unreliable identifications of Plaintiffs, conducting a reckless investigation into the murder of Michael Roybal. Defendants acts and/or omissions that caused these violations were done with deliberate indifference to or in reckless disregard of Plaintiffs' rights and the truth.

46. Among other acts and omissions that violated Plaintiffs rights, Defendant TOLEDO in particular, violated Plaintiffs' rights to a fair trial free of unreliable, eyewitness identifications tainted by improper suggestion and manipulation and influence, as set forth in *Manson v Braithwaite*, 432 U.S. 98 (1977), *Neil v. Biggers*, 409 U.S. 188 (1972) and their progeny and violated plaintiffs rights to due process under the Fourteenth Amendment by fabricating false identification evidence of Ronnie and Abraham. Sergio Torres aka Silent, not Plaintiffs, was the person who shot and killed Michael Roybal September 2, 2000. The sole eyewitness who falsely and incorrectly identified Plaintiffs and falsely identified Plaintiff Ronnie Velasquez as the shooter. Benavides' false identification testimony would not have made without the improper influence and interrogation techniques of the Defendant detectives, and provided an identification which was rendered unreliable under the totality of the circumstances and was encouraged to fortify her identification of Ronnie as the shooter and Abraham as the second suspect at trial. Defendants acts and/or omissions causing improper suggest and influence upon eyewitness Roberta Benevides, providing, suggesting and/or implying information designed to convert Benevides away from her initial admissions she had not seen anyone in the doorway, only an arm covered with a blue and white plaid flannel long sleeved shirt and a left hand holding a shiny pistol to a positive identification of Ronnie Velasquez as the shooter and Abraham Villalobos as his companion.

47. Among other acts and omissions that violated Plaintiffs' rights, Defendants Toledo and Cooper in particular, fabricated evidence supporting Benavides' wrongful identification testimony which they withheld from the prosecution and the court and failed to correct Benavides' false testimony when they should have. Defendants failed to disclose material exculpatory and/or impeaching evidence of which they knew as required by *Brady v Maryland*, 323

U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1973) and omitted their
knowledge of Sergio "Silent" Torres' involvement in the shooting. Defendants
suppressed exculpatory evidence to Plaintiffs, namely the likely presence of
gunshot residue on Torres's blue and white flannel Pendelton shirt described by
Benavides consistently throughout her interviews and testimony. Defendants
knew, or should have known this garment was seized from Silent pursuant to a
warrant application by them yet deliberately chose not to subject the garment to
GSR testing. With knowledge of Mona's telephone records, which confirmed a
telephone call from Silent less than 2 hours since the shooting, and Mona's report
that Silent already knew about police inquiring of her at her home and what she
was saying to authorities, Defendants downplayed their knowledge that Silent
correctly identified the weapon used to kill Roybal was .25 caliber, a detail only
defendants knew, linking Silent to the scene of the crime. The identity of the gun
was a detial only the person linked to the killing of Roybal would know from
being present as the shooting. Defendants persisted with grooming Benavides to
change her account to positively placing Plaintiffs, by name, in the apartment
doorway and Ronnie's hand holding the weapon, firing the fatal rounds.

48.    Among other acts and omissions that deprived Plaintiffs of their
rights to a fair trial by continuing the investigation of Plaintiffs when they knew
or were deliberately indifferent to or recklessly disregarded the truth that Plaintiff
Ronnie Velasquez did not shoot Roybal and Abraham Villalobos was not even
present and that evidence they knew pointed directly to Silent as the perpetrator.
They knew Silent had a motive as a member of Dog Patch to harm a Tortilla Flats
gang member at Mona's apartment, was already a suspect in another homicide
being conducted by another law enforcement agency and used his uncle Jaime as
his alibi, as he did when questioned by Toledo about the Roybal killing. Downey
PD gang unit detectives cultivated street information while investigating crimes

and came upon intelligence that Silent had shot and killed someone in early September at an apartment house across the street from the Sunshine Market. No one followed up that information with Silent and as a result Silent escaped punishment for Roybal's killing.

49. The constitutional source of the violations and obligations asserted herein is the Due Process clauses of the 14th Amendment and Plaintiffs assert both procedural and substantive violations thereof. To the extent that the sources of Plaintiffs' rights are any constitutional claim or statutory source other than Due Process, this claim is also predicated on such sources.

50. Defendants, and each of them, conspired and agreed to commit the above described deprivations of Plaintiffs' constitutional rights and acted jointly and in concert to deprive Plaintiffs of their right to be free from unreasonable seizures, to due process, to a fair trial and to be free from groundless criminal prosecutions based on false and unreliable evidence.

51. Defendants, and each of them, engaged in, knew about, or should have known about the acts and/or omissions that caused the constitutional deprivations alleged herein and failed to prevent them and/or ratified/approved them and/or acquiesed to them.

52. Defendants, and each of them, committed the aforementioned acts and omissions in bad faith and with knowledge that their conduct violated well established law.

53. As a direct and proximate result of Defendants' aforementioned acts and/or omissions, Plaintiffs were injured as set forth in earlier paragraphs herein

and are entitled to compensatory and special damages according to proof.

54. The aforementioned acts and omissions of Defendants were committed by each of them, knowingly, willfully, maliciously, oppressively, and/or in reckless disregard of Plaintiffs' rights. By reason thereof Plaintiffs are entitled to punitive and exemplary damages from Defendants according to proof.

**SECOND CLAIM FOR RELIEF**

**DEPRIVATION OF CIVIL RIGHTS BY ENTITY DEFENDANTS**

**42 U.S.C. § 1983 (Monell)**

**(Against CITY OF DOWNEY)**

55. Plaintiffs reallege all foregoing paragraphs and any subsequent paragraphs contained in this complaint as if fully set forth herein.

56. At all relevant times, Defendant CITY and the DPD, an agency and subdivision of Defendant CITY, possessed the power and authority to adopt polices and prescribe rules, regulations, and practices affecting the operation of DPD and its Crime Impact Special Action teams also known as the gang unit, including customs, policies, and practices relating to law enforcement tactics, crime detection, investigations, arrests, criminal filings, evidence and discovery as well as to supervision, performance evaluation, individual administrative investigations, discipline, records maintenance, and/or retention.

57. At all relevant times, Defendants TOLEDO, COOPER, PONDER, SAMANO and DOES 1-10, and each of them, were employees and/or agents of the DPD and Defendant CITY and were under the direction and control of DPD and Defendant CITY.

58. Upon information and belief, at all relevant times, DPD and Defendant CITY, with deliberate indifference to and/or reckless disregard for the safety, security, and constitutional and statutory rights of persons such as Plaintiffs, maintained enforced, tolerated, ratified, permitted, acquiesced in and/or applied policies, practices and customs with respect to the investigation of crimes that are the moving forces behind the constitutional violations suffered by Plaintiffs as alleged herein.

59. Upon information and belief, at all relevant times, DPD and Defendant CITY, with deliberate indifference to and/or reckless disregard for the safety, security, and constitutional and statutory rights of persons such as Plaintiffs, failed to institute policies or provide appropriate training that would enable DPD officers and detectives, agents and/or employees to handle the usual and recurring situations with which they must deal and would prevent the kinds of constitutional violations alleged herein, where the need for such policies, and/or training was obvious.

60. Upon information and belief, at all relevant times, DPD and Defendant CITY, with deliberate indifference to and/or reckless disregard for the safety, security and constitutional and statutory rights of persons such as Plaintiffs, had no established or clear policy when the need for such policy was obvious, did not provide adequate training and supervision, had an ongoing custom and practice that lead to the constitutional deprivations and violations herein alleged. In this case such concerns were the basic minimal Brady obligations owed to the Plaintiffs and the LADA; policies and practices and customs that are designed to ensure all exculpatory and impeaching information be prominently communicated to rank and file in a manner likely to ensure that such information would be presented to, seen by and understood by prosecutors;

that exculpatory and impeaching evidence be fully documented and disclosed in
investigative reports; that such evidence known to law enforcement employees to
be false and misleading be reported, regardless of consequences, eschewing false
and/or fabricated evidence and respecting the constitutional rights of members of
the public with whom DPD officers and detectives come into contact.

61.    Upon information and belief, at all relevant times prior to and since
September 2000, DPD and Defendant CITY had knowledge of repeated
allegations and instances of misconduct by officers and detectives, employees and
agents of DPD and CITY with respect to the investigation and prosecution of
criminal offenses, including but not limited to the suppression of exculpatory and
impeaching evidence, falsification of investigative reporting, improper suggestive
witness identification procedures, dishonesty and abuses of authority, either
ratified, condoned, and or acquiesced in such conduct, failed and refused to
investigate and correct such conduct and otherwise turned a blind eye toward
such known misconduct such that it became Defendant CITY's de facto policy,
practice or custom.

62.    Upon the District Attorneys announcement of Plaintiffs having been
declared Factually Innocent, DPD Chief of Police responded to the press release
maintaining Plaintiffs continue to be murders, thereby ratifying the individual
defendants wrongful conduct that caused their convictions.

63.    The customs, policies and practices of DPD and Defendant CITY
were a moving force behind the constitutional deprivations alleged by Plaintiffs
in their First Claim for Relief, resulting in general and special damages to
Plaintiffs to which they are entitled according to proof.

**THIRD CAUSE OF ACTION**

**DEPRIVATION OF CIVIL RIGHTS BY ENTITY DEFENDANTS**

**42 U.S.C § 1983 (*Monell* Violations)**

**(By Plaintiffs Against Defendant COUNTY OF LOS ANGELES)**

64. Plaintiffs refer to and reallege each and every allegation contained in paragraphs 1 through 63 of this complaint, and by this reference incorporate the same herein and make each a part hereof.

65. The Los Angeles County District Attorney's Office, at the times relevant herein, had a custom, policy and/or practice of acting with deliberate indifference to defendants' due process rights by failing to have adequate administrative systems or policies, and/or failing to train its employees and agents, regarding a) the suppression of critical impeachment and *Brady* evidence, b) preventing the presentation of false evidence, c) ensuring that eyewitness identification procedures were reliable and not the result of suggestive activities by law enforcement, and d) ensuring that all impeachment and exculpatory information is disclosed by law enforcement. These failures were particularly evident in serious felony cases where the evidence against the defendant was otherwise weak. The Los Angeles District Attorney's Office was able to obtain convictions in these "tough cases" as a result of these systematic, regularly occurring, and deliberate and/or tolerated failures.

66. For example, in 1979, the LADA prosecuted and convicted Kash Delano Register, just 18 years old, of a murder he did not commit. The prosecution suppressed exculpatory evidence and relied on false testimony to convict Register, and he spent over 34 years in prison until it was finally revealed that the prosecutors at the District Attorney's Office had failed to produce impeachment

and exculpatory evidence to the defense at the time of trial, among other errors.

67.    In 1980, members of the Los Angeles District Attorney's Office relied on testimony by a key jailhouse informant witness, Edward Floyd Fink, to convict Thomas Goldstein of murder. Fink falsely testified that he received no benefits for his testimony even though he pled guilty and received a District Attorney recommendation of a maximum of County Jail time in a pending Grand Theft case, which recommendation was conditioned on Fink subsequently providing satisfactory testimony in the Goldstein murder case. His plea and its terms, though known to some members of the District Attorney's Office, were not communicated to the Goldstein trial prosecutor and were never disclosed to the defense.

68.    In 1981, members of the Los Angeles District Attorney's Office relied on testimony by a key witness, William Acker, known to be mentally unstable and a serial liar, to obtain a conviction against Jesse Gonzales, who was sentenced to death. It was discovered decades later that the Los Angeles District Attorney's Office had in its possession at the time of trial six psychological reports prepared by prison psychologists indicating that Acker had a severe personality disorder and was possibly schizophrenic, which were not disclosed to the defense prior to or at the time of trial.

69. Members of the Los Angeles District Attorney's Office knowingly used false testimony by serial informant Leslie White in a 1981 pre-trial proceeding in *People v. Bonin*, a capital case. White was subsequently rewarded with multiple furloughs from jail and a reduced sentence, but those benefits were never disclosed to the defense. Although at least some members of the Los Angeles District Attorney's Office were aware that White was willing to present false testimony even against defendants facing the death penalty, other members of the Los

Angeles District Attorney's Office continued to use White as a key prosecution witness in other cases, such as the case against Michael Moore, who was tried for a murder of a police officer that occurred in 1982. Although members of the Los Angeles District Attorney's Office systematically provided benefits to White after his testimony in these cases, he was presented as a prosecution witness and permitted to falsely testify in Moore's case that he was not receiving any benefits in exchange for his testimony, even though he was.

70. In 1982, Adam Miranda was convicted of first degree murder with a robbery murder finding and sentenced to death. In 2008, his sentence was vacated when the California Supreme Court determined that the prosecution had failed to disclose material exculpatory evidence to the defense in the form of numerous items of evidence pointing to the prosecution's witness, Joe Saucedo, as having confessed to killing the victim. At Miranda's trial, Saucedo testified that Miranda had killed Hosey and that Saucedo had tried to stop him. None of the evidence impeaching Saucedo was disclosed to the defense at the time of Miranda's trial.

71. In 1982, James Shortt was convicted, largely on the basis of the testimony of notorious jailhouse informant Stephen Cisneros, who (as he later testified) presented false evidence that Shortt had made incriminating statements to him in exchange for which he received sentencing benefits, which benefits were known to members of the Los Angeles District Attorney's Office and never disclosed to the defense. Members of the Los Angeles District Attorney's Office also failed to disclose psychiatric testimony, a psychiatric report, and two probation reports negatively reflecting on Cisneros's credibility. On October 16, 2009, the Ninth Circuit overturned Shortt's conviction on the basis that material, exculpatory information concerning Cisneros had not been disclosed.

72. In 1983, members of the Los Angeles District Attorney's Office prosecuted Anthony Stacy on three counts of first-degree murder by relying on testimony by a witness whose FBI rap sheet revealed thirty arrests and convictions. Nearly 20 years later, in 2002, the Court of Appeal found that the Los Angeles District Attorney's Office had failed to disclose the obvious impeachment evidence concerning the government's key witness and vacated Stacy's conviction. Tellingly, the Los Angeles District Attorney's Office explained that its policy at the time was not to turn over FBI rap sheets, even those containing impeachment evidence valuable to the defense, unless the defense specifically requested it.

73. In 1984, the Los Angeles District Attorney's Office charged Bobby Maxwell with murdering ten men in downtown Los Angeles. Maxwell was convicted largely on the testimony of a witness, Sidney Storch, who the prosecution knew or should have known was an inveterate liar. A federal court reversed Maxwell's conviction 25 years later, in 2009, when it was discovered that members of the Los Angeles District Attorney's Office had suppressed impeachment evidence concerning the details of the key witness's plea negotiations, which evidence established that Storch was sophisticated and contradicted the naivete he professed at trial. After Maxwell's trial, Storch went on as a prosecution witness at two trials in 1985, *People v. Stephen Naquin* and *People v. Carl Jones*, and lied at both trials about the benefits he received for testifying in the Maxwell case, among other lies.

74. In 1985, Barry Williams was convicted of first-degree murder and sentenced to death. A federal court overturned his conviction 35 years later, in 2016, after concluding that the prosecution relied on false testimony by an unreliable witness and that the prosecution failed to turn over to the defense critical information about a key eyewitness, which the court found "deeply troubling."

75. In 1986, Andrew Wilson was convicted and sentenced to life in prison without the possibility of parole, based on the testimony of Saladena Bishop, which the Los Angeles District Attorney's Office knew or should have known was false and unreliable, and regarding which various items of material evidence was withheld. The Deputy District Attorney's failure to disclose critical impeachment evidence about Bishop's reported history of drug use and prior assaults on the victim, filing of a false police report, and suggestive eyewitness tactics by law enforcement, among other due process errors, caused the District Attorney's Office to concede, decades later, that Wilson was deprived of his right to a fair trial, and he was ordered released after 32 years in prison.

76. In 1989, the Los Angeles District Attorney's Office charged Gerald Atlas with attempted murder and conspiracy to commit murder based on the testimony of an eyewitness, Galvez, whom the prosecution knew had a year earlier pled guilty to felony murder, been placed on probation, and then violated her probation. Atlas was convicted and sentenced to 28 years to life in prison. In 1998, Atlas's conviction was vacated following post-conviction proceedings in which Atlas presented evidence showing that the prosecution failed to turn over impeachment evidence to the defense concerning Galvez's prior conviction at the time of trial.

77. In 1992, Michael Smith and Timothy Gantt were arrested for the stabbing murder of a college student. Sterling Norris, the same deputy district attorney who knowingly permitted Leslie White to testify falsely in the Bonin case in 1981, filed charges based almost entirely on a statement by an in-custody witness, David Rosemond, who said he had seen the attack on the student. Smith and Gantt were convicted and sentenced to life in prison without the possibility of parole. In a post-conviction evidentiary hearing, Rosemond recanted his

identification and said he was coerced by police to identify Gantt and Smith. A federal judge found that material evidence had not been disclosed to the defense and set aside Gantt's conviction. Smith's conviction was also vacated.

78. In 1995, Obie Anthony and Reggie Cole were wrongfully convicted for a murder for which neither had any involvement. In 2011, the Los Angeles County Superior Court found that a "sweetheart" deal was given to the prosecution's key witness, John Jones, "an inherently unreliable witness," in his own prosecution for pimping and pandering, as an undisclosed "quid pro quo" for his testimony against Anthony and Cole. Both police and members of the Los Angeles District Attorney's Office denied the existence of the quid pro quo deal and concealed the benefits received by John Jones in return for his testimony, and this information was not communicated to the prosecutor who tried the Anthony/Cole case. At trial, John Jones testified falsely that he did not receive any special consideration, which testimony was not corrected by the prosecution. Both men were convicted but subsequently released when court granted their habeas petitions.

79. Consistent with and further illustrating the Los Angeles District Attorney's Office custom, policy and practice of deliberate indifference to defendants' due process rights, the Report of the 1989-90 Los Angeles County Grand Jury ("Report") concluded that the District Attorney's Office had an unchecked and uncontrolled custom, policy and practice of permitting individual prosecutors to extend benefits to witnesses who testified for the prosecution, even when it was known that the witnesses were providing false evidence.

80. The Report focused on prosecutors' use of unreliable informant testimony and concluded that between 1979 and 1990, "the Los Angeles District Attorney failed to fulfill the ethical responsibilities required of a public prosecutor

by its deliberate and informed declination to take the action necessary to curtail the misuse of jail house informants." The "misuse of jail house informants" is merely another way of saying "knowingly presenting unreliable and fabricated evidence," and "failing to disclose impeachment evidence regarding those witnesses as required under Brady." The core constitutional violation is one and the same.

81. The Report also states that one management official at the Los Angeles District Attorney's Office explained that in his or her experience, "over the years in tough cases . . . where we have filed a case and we know the defendant did it, but the amount of available evidence is a little on the thin side, and a statement would be helpful, that sooner or later those statements become available to us." The representative of the District Attorney's Office added that this was "a fairly common practice." In other words, the common practice was that in tough cases where the evidence was thin, badly needed witness testimony would materialize—one way or another—to ensure that the District Attorney's Office obtained the convictions it sought.

82. Providing the information to allow the defense a full and fair cross examination of government witnesses whose testimony is important to the outcome of the case is critical to due process. The suppression of material impeachment evidence, particularly for key state witnesses, often requires the reversal of a conviction or the vacating of a sentence, but such violations typically take decades to uncover. The violations that have been uncovered to date are not isolated cases.

83. These cases provide strong evidence that there were customs, policies practices or failures in place whereby countless defendants were denied their due process rights, as Plaintiffs were.

84. In Plaintiffs' case, as with many other cases involving serious felony convictions obtained in the 1980s and 1990's, critical impeachment evidence concerned key prosecution witnesses was not disclosed and remained buried for decades, while false and misleading evidence was allowed to be presented. Exculpatory evidence was suppressed pursuant to the District Attorney's Office's customs, policies practices and failures under which impeachment evidence relating to key prosecution witnesses, who were known by the prosecution to be unreliable, was not disclosed. This was particularly so in tough cases, such as Ronnie and Abraham's where the evidence was thin, and would be significantly undermined by the suppressed exculpatory and impeachment evidence.

85. As the foregoing recitation of known cases demonstrates (and there are, by definition, many more that are not known), the Los Angeles District Attorney's Office, throughout the 1980's, 1990's and into the 2000's, systematically failed to have systems or established policies in place, and to train and supervise its attorneys, to prevent the use of false evidence and to require the full and prompt production of exculpatory evidence to the defense. It similarly failed to ensure that trial attorneys knew, learned of, and disclosed exculpatory evidence; to provide the means and information to determine whether evidence was reliable; to ensure that its trial attorneys learned all important information for a case, including exculpatory evidence. Throughout this period, it had no established policies, systems, training or supervision for meeting constitutional standards for a) turning over exculpatory evidence, b) preventing the presentation of false evidence, c) ensuring that eyewitness identification procedures were not suggestive and were reliable, or d) tracking evidence it was constitutionally obligated to learn and disclose.

86. Upon information and belief, and as alleged above, during the 1980s and 1990s to recent times, the LADA's Conviction Integrity Unit (CIU) and

Defendant COUNTY had knowledge of repeated allegations and instances of misconduct by members of the prosecution team, including prosecutors, police officers, deputy sheriffs and employees and/or agents of the the County's law enforcement agencies, including and not limited to the City of Downey and LADA in relation to the investigation of criminal offenses prosecuted by the LADA, including fabrication of evidence, use of unduly suggestive and improper eyewitness investigation techniques, suppression of exculpatory and impeachment evidence, dishonesty, and abuse of authority. All of the foregoing customs, policies practices and failures occurred with deliberate indifference to the rights of criminal defendants, including Plaintiffs herein, and even though members of the supervisory staff of the District Attorney's Office were or should have been aware of these customs, policies practices and failures.

87. These customs, policies practices and failures were so closely related to the deprivation of the plaintiffs' rights as to be a moving force that caused their wrongful conviction. Due to these customs, policies, practices and failures, Plaintiffs were deprived of their rights to a fair trial. Had the prosecutors here been properly trained and supervised, and had there been proper systems and policies in place, they would have learned and disclosed the use of false evidence, the suppression of exculpatory evidence, and the practices of influencing witness testimony, contrary to their constitutional obligations, and such disclosures would have been routine practice.

**FOURTH CAUSE OF ACTION**

**FAILURE TO TRAIN & SUPERVISE**

**(By Plaintiffs Against Defendants DET. DUANE COOPER, DET. GILBERT TOLEDO, DET D. PONDER, DET. SAMANO DOES 1-10 in their individual capacities)**

88. Plaintiffs refer to and reallege each and every allegation contained in

paragraphs 1 through 87 of this complaint, and by this reference incorporates the
same herein and makes each a part hereof.

89.    Defendants Toledo, Cooper, Ponder, Samano, DOES 1-10 are sued in
their individual capacities. At dates and places unknown to plaintiffs, prior to the
September 2, 2000 homicide investigation into the death of Michael Roybal,
Defendant TOLEDO was assigned to DPD's Crime Impact Special Action team,
also known as a gang crime investigation and intelligence ensemble, supervised and
managed by DOES 1-3, sergeants, lieutenants, captains and ultimately the Chief of
Police. Toledo, Cooper, Ponder and Samano reported to DOES 1-3. Toledo became
lead investigator alongside co-defendants Cooper, Ponder and Samano . Throughout
the course of defendants investigation into detecting the persons responsible for the
death of Roybal, defendants were expected and were required to apply their
department resources, law enforcement education and experience and training,
subject to the oversight and supervision of DOES 1-3. On information and belief,
said ranking management and supervisory defendants knew or reasonably should
have known of their subordinates ongoing and repeated constitutional violations
detailed herein in the administration of the Downey Police Department Detective
Division. Specifically, defendants knew or should have known of repeated failures
to constitutionally investigate crimes, small and large, and abide by generally
accepted law enforcement investigative and constitutional principles, relating to the
detection of crime, eyewitness identification of suspects, identification of witnesses,
preservation of evidence, to know and understand duties of disclosures of evidence
to prosecutors, against the suppression of exculpatory and impeaching evidence, and
engaging in dishonest, immoral and criminal behavior which violated the
constitutional rights of members of the public, including Plaintiffs herein. Said
failures to act to prevent constitutional misconduct by subordinates acquiesced,
condoned and ratified the customs, practices and usages by subordinates which

violated the constitutional protections of Plaintiffs and persons similarly situated to them.

90.    Said Defendants, and each of them, are sued for their own culpable actions and omissions in the training, supervision and control of personnel assigned to the Detective Division which actions demonstrated a reckless and callous indifference to the rights of persons such as plaintiffs. Said defendants' actions, inactions, reckless disregard and deliberate indifference set into motion the ultimate harm caused to plaintiffs

91.    Plaintiffs are informed and believe and thereon allege that prior to the incident complained of herein, since at least 1992 City of Downey Police Department detectives, supervisors, and management charged with the administration of the Downey Police Department knew or reasonably should have known that employees of the Downey Police Department historically committed similar abuses, unjustified arrests and prosecutions, derelictions of duty, discrimination, dishonesty, reckless disregard and deliberate indifference to serious forms of misconduct.

92.    Plaintiffs are informed and believe and thereon allege that prior to the incident complained of herein in September 2, 2000 and dating backwards to as early as 1992, and forward to the present time, supervisory and executive employees of the Downey Police Department, including the named individual defendants and DOES 1-10 and others charged with the administration of the Detective Division and other departments within the Downey Police Department failed to take corrective action to prevent the misconduct which are the proximate cause of Plaintiffs damages.

93.    As the result of the supervisory, management and executive Defendants

DOES 1-10's failures, actions and omissions, amounted to the institutional repudiation of constitutional protections which became the moving force behind the damages done to Plaintiffs.

**FIFTH CAUSE OF ACTION**

**VIOLATIONS OF CALIFORNIA CIVIL RIGHTS ACT**

**(By Plaintiffs Against All DOWNEY & COUNTY Defendants)**

**Civil Code § 52, 52.1**

94. Plaintiffs refer to and replead each and every allegation contained in paragraphs 1 through 93 of this complaint, and by this reference incorporates the same herein and makes each a part hereof.

95. On or about July 31, 2024 Plaintiffs timely filed Claims with Defendant COUNTY pursuant to California Government Code §910 which became assigned File Number 23-4424831*001 and 23-4424831*002. Said claims were rejected without investigation September 4, 2024.

96. On or about July 31, 2024 Plaintiffs timely filed Claims with Defendant CITY OF DOWNEY pursuant to California Government Code §910 which became assigned File Number 24072 and 24073. Said claims were rejected October 1, 2024.

97. On or about the above stated dates, and sometime prior thereto, Defendants and each of them, while acting under color of law, caused Plaintiffs to deprived of rights, privileges, and immunities, guaranteed by the United States Constitution, federal law, the California Constitution and the laws of the State of California by threats, intimidation and/or coercion thereby violating California Civil Code Section 52.1(a)(b), by *inter alia*, fabricating evidence, failing to

disclose material exculpatory evidence, failing to correct false evidence, using suggestive and improper eyewitness identification techniques resulting in false and unreliable identifications, conducting a reckless investigation into the murder of Michael Roybal, and thereby allowing Sergio "Silent" Torres, the true killer, to escape of criminal responsibility for his crime. Defendants' acts and/or omissions that caused these violations were done with deliberate indifference to or in reckless disregard of Plaintiffs' rights and the truth.

98. As a proximate result of the aforementioned acts of Defendants, and each of them, Plaintiff suffered damage in a sum according to proof, and is entitled to the damages, statutory damages, treble damages, attorney's fees and costs provided for by Civil Code sections 52 and 52.1.

//

//

//

//

//

//

//

**PRAYER**

WHEREFORE, Plaintiffs pray judgment against Defendants and each of them, as follows:

AS TO EACH CAUSE OF ACTION AS APPLICABLE

1. For General damages according to proof;
2. For Special damages according to proof;
3. For Punitive damages as provided by law, in an amount to be proved against each individual Defendant;
4. For attorney's fees pursuant to 42 U.S.C § 1988 and California Civil

Code §§52, and 52.1;

5. For Costs of suit;

6. For such other and further relief as the Court may deem proper.

DATED: February 3, 2025 **THE BECK LAW FIRM**

By THOMAS E. BECK
Thomas E. Beck
Attorneys for Plaintiffs

**McLANE, BEDNARSKI & LITT, LLP**

By DAVID S. MCLANE
David S. McLane

**PLAINTIFFS' JURY DEMAND**

Plaintiffs hereby demands trial by jury.

DATED: February 3, 2025 **THE BECK LAW FIRM**

By THOMAS E. BECK
Thomas E. Beck
Attorneys for Plaintiffs

**McLANE, BEDNARSKI & LITT, LLP**

By DAVID S. McLANE
David S. McLane